CONTINENTAL INSURANCE CO., a/s/o Tradearbed, Inc. and Tradearbed Canada, Inc., Plaintiffs,

v.

M/V "OCEAN JADE", her engines, boilers, etc., and Pan Ocean Shipping Company Ltd., Defendants.

No. 02 Civ. 8911(VM).

United States District Court, S.D. New York.

June 20, 2003.

---

Lawrence C. Glynn, Nicoletti, Hornig, Campise, Sweeney & Paige, New York City, for Plaintiffs.

Christopher H. Mansuy, DeOrchis & Partners, LLP, New York City, for Defendants.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Continental Insurance Co. ("Continental"), as subrogee of TradeArbed Inc. and TradeArbed Canada, Inc. (collectively, "TradeArbed"), brought this admiralty action to recover damages arising out of a shipment of steel rebar from Yantai, China to Philadelphia, Pennsylvania in the summer of 2000. In response, defendant Pan Ocean Shipping Co. ("Pan Ocean"), the owner of M/V "Ocean Jade," moves to stay proceedings in this Court pending arbitration, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3. For the reasons set forth below, the motion is GRANTED.

## I. BACKGROUND

On April 3, 2000, TradeArbed, as charterer, entered into a charterparty agreement (the "Charterparty") with Pan Ocean, the shipowner, for carriage of 20,000 metric tons of steel rebar from Yantai, China to ports in Savannah, Georgia, Wilmington, North Carolina and Eddystone, Pennsylvania, at a rate of $25 per metric ton. (See Charterparty, attached as Exh. A to the Declaration of Kil Ho Choi ("Choi Decl."), dated March 12, 2003.) The Charterparty contains two clauses of particular relevance to the instant motion. Clause 18 stipulates that Pan Ocean is to nominate a vessel, conforming to certain specifications, to perform the Charterparty. Clause 55 contains an arbitration provision, stating, in relevant part, that "any dispute aris[ing] between Owners and Charterers . . . shall be referred" to three arbitrators in New York. Based on the record before the Court, the Charterparty is the only agreement of its kind extant between TradeArbed and Pan Ocean.

In an email to TradeArbed, dated April 20, 2000, Pan Ocean tendered the nomination of the vessel referred to as M/V "Ocean Jade" for carriage of 20,000 metric tons of steel rebar to the United States from Yantai. TradeArbed accepted the M/V "Ocean Jade" to perform the Charterparty. On May 26, 2000, based on the parties' agreement concerning performance of the Charterparty, Pan Ocean issued a bill of lading (the "Bill of Lading") for approximately 15,000 metric tons of rebar to be shipped from Yantai, China to Philadelphia on the MV "Ocean Jade".[1] The Bill of Lading, which was issued on a form typically employed in connection with charter agreements, identifies TradeArbed as the consignee, and includes the following condition of carriage: "All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, including the Law and Arbitration Clause, are herewith incorporated." (Bill of Lading, attached as Exh. C to Choi Decl., at 1.) The space on the front of the Bill of Lading providing for a date identifying the Charterparty is left blank ("Freight payable as per CHARTER–PARTY dated _____"), although the words "FREIGHT PAYABLE AS PER CHARTER PARTY" appear prominently just below the shipper's description of goods. (Id. at 2.)

On June 12, 2000, an agent of Pan Ocean issued a freight bill to TradeArbed for the 20,207 metric tons of rebar loaded at Yantai on May 29, 2000. The freight amount was calculated at the rate of $25 per metric ton, which is the rate agreed upon by the parties in Clause 53 of the Charterparty. TradeArbed paid this freight bill, and the M/V "Ocean Jade"

---

1. The Bill of Lading indicates the number of original bills of lading as three. Presumably the other two bills, which are not a part of this record, account for the approximately 5,000 metric tons of rebar carried by the M/V "Ocean Jade" to Savannah and Wilmington.

carried the rebar to the Port of Philadelphia, where TradeArbed arranged for stevedores to discharge the cargo in late July 2000. According to an insurance claim filed by TradeArbed in December 2001, approximately 100 bundles of the steel rebar unloaded from the M/V "Ocean Jade" had been "totally destroyed" some time prior to being picked up by TradeArbed's customer. (*See* Warehouse Claim, attached as Exh. E to Choi Decl.) Continental, as subrogee of TradeArbed, brought this admiralty and maritime claim to recover for these alleged damages.

Pan Ocean moves to stay these proceedings pending arbitration, alleging that the Charterparty, which requires arbitration of all disputes arising between shipowners and charterers, is the contract of carriage that governs relations between Pan Ocean and TradeArbed, Continental's subrogor, including the damage alleged in this case. Continental counters that the Bill of Lading, and not the Charterparty, provides the relevant contract of carriage for the shipment to Philadelphia on the M/V "Ocean Jade". Continental further argues that the Bill of Lading does not specifically identify the Charterparty, and thus fails to incorporate its arbitration provision.

## II. *DISCUSSION*

The law is well settled that where a charterer and a ship owner enter into a charterparty agreement, the charterparty, and not the bill of lading issued for the goods in any particular shipment, constitutes the contract of carriage as between the signatories of the agreement. *See, e.g., Vanol USA, Inc. v. M/T CORONADO,* 663 F.Supp. 79, 81 (S.D.N.Y.1987) (holding that the bill of lading signed by the shipper's agent is not a contract of carriage between the parties "because the cargo was shipped pursuant to the terms and conditions of the voyage charterparty between [the parties] making it the governing contract of carriage.") Rather, a bill of lading covering goods shipped aboard a vessel pursuant to a charterparty acts not as the contract of carriage, but as a mere receipt for the goods, so long as it remains in the hands of the charterer. *See The Fri,* 154 F. 333, 337 (2d Cir.1907) ("The rule is that where there is a charter party, the bill of lading operates as the receipt for the goods, and as a document of title passing the property of the goods, but not as varying the contract between the charterer and the shipowner."); *In re Marine Sulphur Queen,* 460 F.2d 89, 103 (2d Cir.1972); *Ministry of Commerce v. Marine Tankers Corp.,* 194 F.Supp. 161 (S.D.N.Y.1960) ("[I]n cases where the bill of lading remains in possession of the charterer himself, *i.e.,* in a controversy between charterer and shipowner, the bill of lading has been regarded as a mere receipt which does not supersede the charter provisions."); *State Trading Corp. of India, Ltd. v. Grunstad Shipping Corp. (Belgium) N.V.,* 582 F.Supp. 1523, 1524 (S.D.N.Y.1984). As the Fifth Circuit has succinctly explained, "... the contractual terms in the voyage charter, which were actively negotiated by the parties, are far more probative of the intentions of the parties than is a bill of lading which is normally considered a receipt, and which was issued as a matter of course by a third party agent who was removed in time and space from the negotiations regarding the charter." *Cargill Ferrous Int'l v. SEA PHOENIX MV,* 325 F.3d 695, 702 (5th Cir.2003).

On the other hand, when a bill of lading has been negotiated to a third-party consignee, even where there is an underlying charterparty agreement, the bill, and not the charterparty, constitutes the contract of carriage governing relations between the shipowner and the bill's holder.

*See United States v. Wessel, Duval & Co.,* 115 F.Supp. 678, 682 (S.D.N.Y.1953) ("'Where the bill of lading has been transferred for value to third persons who are strangers to the charter party, its terms become very important. It then constitutes an undertaking on the part of the shipowner with the holders, which is independent of the charter party, except so far as that is expressly incorporated in it.'") (quoting *The Fri,* 154 F. at 336).

Continental argues that the Bill of Lading does not effectively incorporate the Charterparty. However, it is only when a bill of lading is in the hands of a third-party consignee that the question of whether the provisions of the charterparty have been effectively incorporated into the bill of lading, so as to govern the contractual relations between the shipowner and the consignee, is relevant. *See Cargill B.V. v. S/S "Ocean Traveller",* 726 F.Supp. 56, 59 (S.D.N.Y.1989); *State Trading Corp.,* 582 F.Supp. at 1524 (where the carrier itself was a party to the charter and had full notice of its terms, the court refused to permit it to claim benefits resulting from the failure of the bill of lading to identify the charterparty by date and identity of its signatories). Here, on the other hand, as between the charterer and the shipowner, who are the original signatories to the Charterparty, the Charterparty is the contract of carriage and its provisions govern, notwithstanding any questions regarding the effectiveness of their incorporation into the Bill of Lading. *See Vanol USA,* 663 F.Supp. at 81 (holding that as between the parties to a voyage charterparty, bills of lading were mere receipts, and the rights and liabilities of the parties were governed by the terms of the charterparty). Therefore, in this case, the Charterparty is the contract of carriage that governs the shipment and damages at issue, and the arbitration clause of the Charterparty applies to the dispute between Continental and Pan Ocean.

Continental attempts to differentiate this case from the settled doctrine distinguishing contracts of carriage that apply to original signatories of a charterparty and those that apply to third-party consignees of a bill of lading by pointing to factual elements present in other cases abiding by this doctrine that are not present here. However, the Court is not persuaded that those factual differences make the overriding doctrine inapplicable. First, Continental notes that in *Cargill* the bill of lading in question made reference to the applicability of the "Arbitration Clause of the 'Centercon' charter-party." 726 F.Supp. 56, 59 (S.D.N.Y.1989). However, while this provision was one basis for the decision, the *Cargill* court further held that, despite the failure to reference the date of the underlying charterparty in the bill of lading, because the parties were the original signatories to the charterparty, "[w]hatever may be the merits of [the] argument in a case where consignor or consignee under the bill of lading is without adequate notice of the terms of a charter party adopted by cross-reference, this contention [has] no application to the very party that negotiated that charter." *Id.* Nothing in *Cargill* indicates that both of these bases for the decision must be met. To the contrary, the *Cargill* court states the second reason as a blanket rule that need not be supported by further evidence. *Id.*

Continental seeks support for a similar distinction in *Sulphur Queen* and *State Trading.* In *Sulphur Queen,* the court flatly states that bills of lading do not serve as contracts for the carriage of goods when the shipper and carrier have entered into a charterparty containing the terms of the carriage contract. 460 F.2d at 103. The court also notes, however,

that "[t]he fact that the parties intended this result is borne out quite clearly by ¶ 29 of the charter party which provides that any bill of lading 'shall be without prejudice to the terms, conditions and exceptions of this Charter Party....'" *Id.* Continental makes much of the fact that the Charterparty in this case contains no such language. There is nothing in *Sulphur Queen,* however, that suggests that the absence or inclusion of such a clause in the charterparty has any bearing whatsoever on the settled rule of law concerning bills of lading issued pursuant to a charterparty. On the contrary, the court in that case points to the clause in question merely as evidence that the parties intended for their contract to conform to this rule of law.

In this case, there is other evidence serving the same purpose. This evidence includes, among other things, the fact that the parties' conduct, including the procedure by which the M/V "Ocean Jade" was nominated and the rate at which payment for the cargo was made, all conformed to the terms of the Charterparty—terms which were absent from the Bill of Lading. Thus, because it is clear that the parties to this Charterparty intended that document, and not the Bill of Lading, to serve as the contract of carriage for the shipment at issue here, Continental's attempts to distinguish *Sulphur Queen* are unpersuasive.

In *State Trading,* a third-party consignee of a bill of lading sought to enforce the provisions of the charterparty against a signatory of that agreement. 582 F.Supp. at 1523. The proper question in *State Trading* therefore, unlike the case at hand, was whether the bill of lading properly incorporated the charterparty. Even so, the court held that because there was no confusion as to which charterparty applied to the carriage of goods—a holding this Court finds applicable here, as detailed

below—the charterparty applied. *See id.* at 1524. Continental points to a portion of the opinion in *State Trading* suggesting, among the reasons the parties in the case could not have been confused as to which charterparty was referenced in the bill of lading, despite the fact that the date and signatories of the charterparty were missing, was a provision in the charterparty that any bill of lading would be subject to the underlying charterparty's terms. That this clause is missing from the Charterparty at issue here, however, does not detract from the overriding rule that where there is no confusion as to the applicable charterparty, which is particularly the case where the dispute is between the actual signatories to the Charterparty, the specific underlying agreement must be enforced.

In fact, all the cases relied upon by Continental for the proposition that the bill of lading is the contract of carriage where the charterparty is not properly incorporated into the bill of lading, involve situations in which the plaintiff or cargo claimant is a third-party holder of the bill of lading, not a party to the charterparty. *See, e.g., Midland Tar Distillers, Inc. v. M/T Lotos,* 362 F.Supp. 1311 (S.D.N.Y. 1973) (holding that the bill of lading effectively incorporated the terms of the charterparty, and that those terms were binding upon a third-party holder of the bill); *Associated Metals & Minerals Corp. v. M/V ARKTIS SKY,* No. 90 Civ. 4562, 1991 WL 51087, at *3 (S.D.N.Y. Apr.3, 1991) (holding that references in the bill of lading to a charterparty did not provide sufficient information which would indicate to the third-party holder of the bill the specific charterparty sought to be incorporated); *New York Marine Managers, Inc. v. Ektrans Int'l Transp. & Trade, Inc.,* No. 88 Civ. 3682, 1989 WL 4030, at *5 (S.D.N.Y. Jan.17, 1989) (holding that the bill of lading did not provide its third-party holder with sufficient information to find the right

charterparty, or distinguish it from any other charterparty); *Son Shipping Co. v. DeFosse & Tanghe*, 199 F.2d 687 (2d Cir. 1952) ("Where terms of the charter party are, as here, expressly incorporated into the bills of lading they are a part of the contract of carriage and are binding upon [the ultimate consignee] just as they would be if the dispute were between the charterer and the shipowner.") These cases are inapposite here, where the dispute is between the parties to the charterparty, and where the bill of lading remains in the hands of the charterer, TradeArbed.

■ The rationale behind the decisions relied upon by Continental, indicating the need for specific reference to the charterparty in the bill of lading where a third-party consignee is involved, further supports this conclusion. The rule developed in those cases is that in order to enforce a charterparty arbitration clause against a third-party holder of a bill of lading, the bill must "specifically refer" to the charterparty and incorporate the arbitration provision "in unmistakable language." *Associated Metals*, 1991 WL 51087, at *1; *accord Import Export Steel Corp. v. Miss. Valley Barge Line Co.*, 351 F.2d 503, 506 (2d Cir.1965). In addition, the holder of the bill must have actual or constructive knowledge of the incorporation. *See Associated Metals*, 1991 WL 51087, at *1. The reason for these specificity and notice requirements is that "it is unfair to bind a holder of a bill of lading to additional terms he cannot locate." *New York Marine Managers*, 1989 WL 4030, at *5. When the party resisting arbitration is a signatory to the charterparty, and therefore cannot claim ignorance of the relevant terms of that underlying agreement, this rationale is clearly undermined. *See State Trading Corp.*, 582 F.Supp. at 1525 (noting that the rationale behind the specificity and notice requirements "loses its force when the party resisting arbitration was a signatory to a charter party . . ."). As the Court remarked in *Cargill*, "having agreed to ... arbitration in a freely negotiated charter party, [the charterer] cannot avoid that obligation by claiming the rights it might have if it were merely the assignee of a bill of lading." 726 F.Supp. at 60.

In a case such as the one at hand, where the Charterparty signatories are the same parties as those to the Bill of Lading, and where there is no confusion as to who the charterer was, the Court finds inapplicable the rationale requiring clear reference to the specific Charterparty governing the carriage in the Bill of Lading. Rather, the Charterparty is the contract of carriage governing the dispute, despite any deficiencies in the Bill of Lading.

Continental, nevertheless, contends that there was, in fact, "palpable confusion concerning *which charterparty* governed the rights of the charterer [TradeArbed]." (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Stay Proceedings, dated March 26, 2003, at 8) (emphasis added). Unlike the case in *Joo Seng Hong Kong Co. v. S.S. Unibulkfir*, 493 F.Supp. 35, 40 (S.D.N.Y.1980), however, where three charterparties were involved in the shipment, and the court determined that it could not conclude with any certainty to which charterparty the bills of lading referred, the record in this case is devoid of any evidence that these parties had entered into any charterparties other than the one dated April 3, 2000. Furthermore, TradeArbed, Continental's subrogor, paid for the shipment according to the freight rate stipulated by the Charterparty. Thus, even without an identifying date, the Bill of Lading's references to "the Charter Party" should not have engendered any "confusion" in the mind of the very party that negotiated its provi-

sions less than two months prior.[2] Just as was the case in *State Trading,* Continental "could not have been confused regarding which charter party the bill of lading sought to incorporate." 582 F.Supp. at 1524.

■ Although the Charterparty signatories remain free to alter the terms of their charterparty using a new bill of lading, for a court to enforce such an alteration, there must be proof that the parties actually intended to make a new contract. *See Nichimen Co. v. M.V. Farland,* 462 F.2d 319, 328 n. 4 (2d Cir.1972). Here, however, there is no evidence that either Pan Ocean or TradeArbed intended the standard form Bill of Lading to supercede the detailed terms of the Charterparty. On the contrary, the Bill of Lading expressly provided for incorporation of "All terms and conditions, liberties and exceptions of the Charter Party, dated as overleaf, *including the Law and Arbitration Clause.*" (Bill of Lading at 1.) (emphasis added). Furthermore, the type of bill of lading form used by the parties (code named "CONGENBILL") carries the heading "TO BE USED WITH CHARTER–PARTIES." (*Id.* at 2.)

Even more persuasive is that the procedures by which the parties selected the vessel, and the rate at which the freight bill was calculated and paid, all conformed to the specific provisions of the Charterparty. To prove that the parties, despite following the stipulations of these key Charterparty provisions, nevertheless intended to exclude from operation the arbitration clause would require more than the mere failure to fill-in the space identifying the date of the Charterparty.

■ Finally, the Court notes that the FAA establishes a strong federal policy in favor of referring parties to arbitration over litigation, if the parties agreed to arbitrate their disputes. *See, e.g., Sandvik v. Advent International Corp.,* 220 F.3d 99, 104 (3d Cir.2000); *Doctor's Associates, Inc. v. Stuart,* 85 F.3d 975, 981 (2d Cir. 1996); *Carcich v. Rederi A/B Nordie,* 389 F.2d 692, 696 (2d Cir.1968). Moreover, "[t]he Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Here, whatever doubts that exist are properly resolved in favor of arbitration. The Charterparty in this case clearly commits the parties to arbitration, and since no confusion or unfairness has been demonstrated by Continental, arbitration is the appropriate forum for resolution of this dispute.

In sum, because Pan Ocean and TradeArbed were the original parties to the Charterparty, and the Bill of Lading makes reference to the applicability of an underlying charterparty, the Court is not convinced that there could have been any confusion as to which charterparty governed, since only one Charterparty appears to have governed the relationship between TradeArbed and Pan Ocean, and there is no indication that Pan Ocean or TradeArbed intended to amend the Char-

---

2. Continental also argues that the omission of the "USA Clause Paramount" from the Bill of Lading, which was required to be included by the Charterparty, added to the confusion and the failure to incorporate the Charterparty. However, the case law clearly indicates that absent real confusion as to which charterparty applied, such an omission is not legally significant. *See United States v. Wessel, Duval & Co.,* 115 F.Supp. 678, 683 (S.D.N.Y.1953) ("The omission of the clause from the straight bills of lading issued in this case does not cast doubt on [the court's] interpretation ..."); *Steel Coils, Inc. v. Captain Nicholas I M/V,* 197 F.Supp.2d 560, 566 (E.D.La.2002).

terparty itself. Accordingly, the Court finds that the Charterparty, including the arbitration clause, governs the dispute between Pan Ocean and Continental. Therefore, pursuant to the terms of the Charterparty, further proceedings in this Court with respect to this case are stayed and the dispute is referred to arbitration in accordance with 9 U.S.C. § 3 of the FAA.

### III. *ORDER*

For the foregoing reasons, it is hereby

**ORDERED** that proceedings in this case are stayed pending arbitration, pursuant to the Charterparty defined herein; and it is further

**ORDERED** that this action is discontinued without prejudice to being reopened by Continental following arbitration for the purpose of enforcing any award rendered in arbitration, or to consider any issues remaining in dispute that are not subject to the arbitration provision of the Charterparty at issue here.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**